[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO SET ASIDE THE VERDICT
DID THE COURT ERR IN NOT FINDING THAT THE NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS WAS BARRED BY THE EXCLUSIVE REMEDY PROVISION OF THE WORKER'S COMPENSATIONS ACT?
If the injury for which the employee brings suit against an employer is compensable under the act, the suit is barred. A way to approach the problem is to examine the court manufactured test that must be satisfied to prove coverage under the act. Our court has said the following:
 "It is axiomatic of workman's compensation law that awards are determined by a two part test. The employee has the burden of proving that the injury claimed arose out of the employment and occurred in the course of the employment. `There CT Page 8452 must be a conjunction of the two requirements,' `in the course of the employment' and `out of the employment' to permit compensation. The former relates to the time, place and circumstances of the accident while the latter refers to the origin of cause of the accident." McNamara v. Hamden, 176 Conn. 547, 550 (1979).
The court immediately thereafter made a statement that, at least in this court's opinion, belies the this defendant's characterization of the problem before the court as one that can be resolved by a simple black and white or "Ja", "Nien" analysis.McNamara said: "While easily stated this test has been confused over the years. `Its formulation has been easier than its application.' This confusion has developed as a result of a half century of factual variations on the legal rule." Id. p. 550.
If an injury does not arise out of and in the course of employment, it is not covered by the act and the employee can bring suit against his or her employer for the simple reason that the act was not designed to and has no purpose in protecting the employer from litigation in that situation.
Can termination from employment ever provide the basis for a common law suit that is not barred by the Worker's Compensation Act? Of course it can. In Crochiere v. Board of Education,227 Conn. 333 (1993) for example the defendant employer who unsuccessfully contested a compensation award claimed as one of its grounds that "(4) mental injury resulting from termination is not compensable." Id. p. 334. The court did not resolve the case within that analytical framework. It began its discussion by saying: "The commissioner also concluded that the plaintiff's injury was not sustained as a result of his termination, but rather arose out of his employment." Id. pp. 357-358. It ended the discussion by saying: . . . "the defendant has not met its burden by demonstrating that the commissioner abused his discretion in making these findings and that the review division improperly sustained them." Id. pp. 358-359. In a footnote at page 357 the court referred to Fulco v. Norwich Roman CatholicDiocesan Corporation, 27 Conn. App. 800 (1992) as standing for the proposition that "emotional distress caused by the manner of an employee's discharge is not a work related injury; therefore, a common law cause of action for negligent infliction of emotional distress is not barred by General Statutes § 31-284
(a), the exclusivity provision of the Worker's Compensation Act." CT Page 8453 Id. pp. 357-358 (footnote 19). Fulco then for a trial court's purposes is still good law and the task is to determine when the employee's suit can be said to arise of his or her termination and when it can be said to be a claim for injury arising out of and sustained in the course of employment.
At least it can be said from reading Crochiere and Fulco
together that injury arising from the manner of discharge and injury that is work related are two different things and such a distinction can be made if the nature of the claim and the facts of a case support such a distinction. Or, to put it another way, it won't suffice to apply an analysis that says employee suits based on termination or manner of discharge are barred based on a simplistic "but for" analysis that says when you were terminated you were employed so your termination has to arise out of and be in the course of employment.
At least for the court the difficulties presented by this case on this just discussed issue are focused by an examination of the following language from Fulco at 27 Conn. App. Pages 808-809:
 "In this complaint, the plaintiff alleged that his emotional distress arose out of his discharge, not out of the conditions of his employment. Thus, the earliest time that the plaintiff's injury could have arisen was immediately after his discharge. It is impossible for the injury to have arisen during the period of his employment because his employment necessarily terminated before the alleged injury arose. It would unduly strain the language of the statute for us to conclude that termination of employment creates a job related injury.
 Further, the plaintiff was not reasonably fulfilling the duties of his employment or doing something incidental to it when he sustained his alleged injury. Clearly, the process of being fired is not a duty of employment. The proper inquiry is whether the process of being fired was incidental to the plaintiff's employment. See McNamara v. Hamden, supra, 551. `[T]he rule for determining whether the activity is incidental to the employment turns on whether the activity is CT Page 8454 regularly engaged in on the employer's premises, within the period of employment, and with the employer's approval or acquiescence.' Pagani v. BT II, Limited Partnership, supra; see McNamara v. Hamden, supra. The critical language here is `regularly engaged in.' By its nature, the process of being discharged normally occurs only once in an employee's tenure. It cannot be considered conduct regularly engaged in as an incident to employment. . . ."
Different considerations are emphasized in the first as opposed to the second paragraph.
In this case the defendant began an investigation into whether or not the plaintiff used company funds to finance private trips to Toronto and a family vacation to Hawaii. He returned from vacation and was told by a travel agent in whose account the funds would have been located that something was going on regarding this matter. He called an immediate supervisor and then learned he was suspended with pay. The plaintiff himself held a supervisory position; he was escorted from his workplace in front of his coworkers on January 12, 1990. An investigatory process then began which the plaintiff argues was unfair. While under suspension, he had to attend a meeting where he claims he was subjected to a one-side and abusive investigatory process. He maintains he was not provided with adequate information to defend himself from the accusations. He was not allowed to return to his office to pick up his personal belongings and the investigatory meeting took place in a building separate from the building where he worked. The jury could have further found that a large part got Kuselias' life was involved with working for this company — even his social life. He worked in sales in the publishing department. Every year an annual meeting is held by the company where awards are presented to the sales force. Kuselias received awards on several occasions and often was a presenter of the awards. While SNET was conducting its investigation, Kuselias was not permitted to attend this annual meeting. All this at a time when coworkers perceived the subject of the investigation as theft or stealing. The jury could have reasonably found these facts and they could have further found that on February 5, 1990 the plaintiff met with Mr. Owens, vice president in charge of publishing — the department he worked in — and Mr. Winch, the plaintiff's immediate supervisor. The jury could have further found at that the February 5 meeting Mr. Owens told the plaintiff CT Page 8455 he would no longer be allowed to work at SNET; that he was told short term disability benefits would be paid for one year and he would be allowed to apply for long term disability benefits after that. If he refused to accept this offer, he was told he would be discharged.
Both sides spend much time and effort in discussing whether the events of February 5, 1990 can be described as a termination. The defendant questions how the plaintiff can claim there was a discharge or termination since he was suspended with pay in January and was not actually fired. Kuselias, on the other hand, notes he was given an either/or proposal which he accepted since he feared losing his medical benefits. Kuselias, after the February 5 meetings, prepared a statement of facts concerning the incident and submitted it to SNET in March. Two weeks later he was advised by Owens he could come back to work, which he did on May 3, 1990. The defendant points out that during the entire period from January 12 to May 3, 1990 the plaintiff continued to receive his full base pay and insurance benefits, he didn't receive a COBRA notice or a "pink slip". On the other hand, between January 12 and February 5, there was an investigation considering whether he should be terminated.
There are really two issues presented. The first issue is whether, if a termination occurred here, did it arise out of the employment and did it occur in the course of the employment.
The second issue is whether there was in fact a termination.
The problem presented by termination cases is related to the fact the "arose out of" and "in the course of" employment test usually is applied in the context of a worker suffering a physical injury at a certain and definite time; the test is less exact when applied to a factual scenario such as the one before the court. The previously quoted language in Fulco underlines the problem. If as Fulco says an action for emotional distress arising out of discharge or termination is not barred by the Workers' Compensation Act, what is meant by termination? Is it the actual act of being told of the discharge on a specific date at a specific time? Some of the Fulco language suggests such an approach. But other language talks of the termination process.
See 27 Conn. App. At pp. 808-809 where the court says: ". . . the plaintiff was not reasonably fulfilling the duties of his employment or doing something incidental to it when he sustained is injury. Clearly, the process of being fired was incidental to CT Page 8456 the plaintiff's employment." In other words, where an employee was suspended and an investigation takes place at a place that is not at his or her work site and at a time when the employee is not at work and the investigatory process leads to discharge, isn't this whole process the termination process?
An appropriate way to approach the question is to first ask what is the injury claimed under this tort. The claim here was not and could not be based on the mere fact of termination or whether the termination was unreasonable, if the jury were to find there was a termination. As the court told the jury:
 "Negligent infliction of emotional distress in the employment context only arises where it is based upon unreasonable conduct of the employer in the process of terminating an employee. An action for negligent infliction of emotional distress focuses on the manner of discharge. The issue is not whether a termination itself was unreasonable or whether its consequences were unreasonable or whether any acts predating the termination process were unreasonable. This case of action turns upon whether the employer's conduct during the process of termination was unreasonable."
The court went on to say that one of the elements Kuselias had to prove was whether SNET "should have realized that its conduct in terminating" the plaintiff's employment "involved an unreasonable risk of causing Mr. Kuselias emotional distress. . . ."
This is not the Crochiere case. That case involved a situation where a teacher in the summer of 1987 had accusations leveled against him that he had molested a young student. The accusations appeared in the newspapers and on television. He was terminated in October and suffered a breakdown in December 1987. The court chiefly focused on whether the injury suffered by the plaintiff could be said to arise out of his employment. 227 Conn. at page 333.
The injury in Crochiere was the mental turmoil resulting from accusations arising out of the plaintiff's alleged conduct while on his job. There was no complaint about the termination process itself or that process was somehow unfair. As the court said: "The plaintiff's mental injury resulted from the metal stress CT Page 8457 associated with allegations of his sexual misconduct allegedly occurring during his music lessons at his place of employment."227 Conn. at p. 350. There was nothing to indicate for example that during any termination process the school bandied about the allegations to a hungry press or that the administration did not give the plaintiff a fair hearing. What caused the plaintiff's mental injury was the accusations themselves.
This court decided the case of Greenleaf v. Ames Dept.Stores, 1 Conn. Ops 218 (1995). There the plaintiff reported to work, was asked to leave the work station she was assigned to and brought to an office. There she was confronted by two management officials and a security officer. She was accused of stealing merchandise. She claimed to have been interrogated for three hours, she also alleged she was never allowed to leave the office to use the restroom, to get water or make a phone call. She claims to have been forced to sign a "voluntary" statement admitting her wrongdoing. Throughout the interrogation, the plaintiff claimed she was led to believe that unless she signed the statement she would be arrested and sent to jail. After signing the statement, the plaintiff was terminated. She later sued her employer and made a variety of claims including false imprisonment and intentional infliction of emotional distress. A motion to strike was filed in which the employer claimed the suit was barred under § 31-284 because the alleged acts leading to the injuries arose out of and in the course of employment. In an analysis that mentioned Fulco but did not even refer to Crochiere
or the nature of termination or the termination process, this court found that the injury alleged arose out of the plaintiff's employment. All the court said was that the plaintiff "was accused of stealing from various departments she worked for in over a 12 year period and security claims to have been altered to her activities by a `hot line' system set up for the use of employees in communicating tips or accusations to management."
Frankly, after a great deal of consideration that has led to an inordinate delay in writing this opinion, I believe Greenleaf
was mistaken. At least I cannot reconcile it with the language ofFulco or the factual setting of Crochiere. If Greenleaf was correctly decided, it is difficult to understand how termination as such could form the basis of a suit against a former employer which is not barred by the "arose out of" language of § 31-284. But Fulco permits such actions and Crochiere does not bar them in the appropriate case. This court did not appreciate the distinction between the termination process as CT Page 8458 process and the underlying facts which gave rise to the initiation of the process.
In any event, the language of Greenleaf does not help the defendant on the requirement that the injury occurred "in the course of employment." The court said on that matter" "As to whether what happened occurred in the `course of employment' — it certainly seems to have occurred in her period of employment. She was `ordered to the store office' (par. 4) `while working her regular shift.' The activity and questioning took place at store facilities. An employee who submits to questioning by security personnel during her work shift would seem to be `reasonably fulfilling the duties of her employment.'" Citing McNamara v.Hamden, 176 Conn. 547, 556 (1979).
Here the jury could have found that the injury Mr. Kuselias suffered occurred as a result of the "process of being discharged." Such a process "cannot be considered conduct regularly engaged in as an incident of employment." Fulco at 27 Conn. App. P. 809. Kuselias was suspended and walked out of his office in front of coworkers. While he was under suspension he was called to an investigatory meeting where he claims he was subjected to intense and hostile questioning at a building separate and apart from his usual work site. He claims he was not given an opportunity to defend himself or presented with documentation relating to the charges being made and was pressured into signing a statement. After repeated inquiries, he was then told to attend a meeting at a private dining club where he alleges and the jury could believe he was told that he would not return to work for SNET; would have to accept disability and if he refused this he would be discharged. The next day he met with another company official, the offer was reiterated and he accepted it out of fear of losing his medical benefits — understandable given his medical condition and his recent almost fatal bout with cancer. He was told to clean out his office over the weekend when no one else was present, which he did removing his personnel papers. This is not the Greenleaf case and these complained of acts which form the basis of the plaintiff's claim of injury cannot be said to occur in the "course of employment."
Furthermore, on the question whether "termination" took place here — when a person is suspended from work, subjected to an investigatory process which ends with being put on disability pay, an admonition that he would not be allowed to work at the company in the future, and instructions to clean out his or her CT Page 8459 desk at a work site he or she had been barred from for several weeks, this is termination for the purposes of the act. What analytical difference does it make that over two months later the company decides to restore the employee to another job and a demoted position at that? If Kuselias had not been allowed to return to the new job on May 3, 1990, it could not be seriously argued that there was no termination on February 5, 1990. Where a worker is placed on suspension from his or her work site while an investigatory process goes on, that process and any injuries it might produce cannot be said to have occurred in the course of employment. If that is so, how can a worker's compensation claim be made? And if the latter is true, how is a worker to have a remedy if a common law suit is barred where the process leading to termination is such that it otherwise would provide the basis for a tort action of negligent infliction of emotional distress? These are difficult questions but the court will not set aside the verdict on the ground claimed[1].
 LACK OF EVIDENCE TO SHOW ALLEGED TERMINATION DONE IN SUCH A WAY AS TO PROVIDE BASIS FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
The court will not review this claim in detail. Based on facts otherwise discussed in this decision and brought out in evidence the jury could have found that the plaintiff's termination was done in an inconsiderate and embarrassing manner. This is not a case of merely an inefficiently conducted or negligent investigation and this issue was for the jury to decide.
INSTRUCTION JURY ON NEGLIGENT INFLICTIONOF EMOTIONAL DISTRESS PREJUDICED DEFENDANT ON DEFAMATION CLAIM
The above stated ground only applies if the plaintiff was not entitled to an instruction on negligent infliction of emotional distress. The court for the reasons stated elsewhere in this decision does not agree with the premise of this position.
 OTHER ERRORS IN INSTRUCTIONS ON NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM
At a section of its post-trial memorandum accompanying its motion to set aside the verdict, the defendant points to what it claims were several errors in the court's charge. Some of these issues are more fully answered in other portions of this opinion. CT Page 8460 The court's conception of termination and the termination process differs from that of the defendant as does its opinion on whether the termination process here was conducted in a humiliating and embarrassing manner. The court instructed the jury that the plaintiff could only recover if based upon the "unreasonable conduct of the employer in the process of terminating an employee".
 PLAINTIFF'S HANDWRITTEN ACCOUNTING OF HIS TRIPS AND FINANCIAL DEALINGS WITH JACK KAHN
During cross examination of the plaintiff, the defendant sought to introduce into evidence the plaintiff's handwritten accounting of his personal trips and financial dealings with the company travel agent, Jack Kahn. It in effect was being offered by the defendant as an out of court statement by the plaintiff to impeach his credibility.
The Court was well aware of the impeachment value of this document and to its memory in fact itself articulated that value in the course of the lengthy argument on this issue which covered many transcript pages.
The Court would note that there was other impeachment of the plaintiff concerning the nature of his relationship with Kahn and the Court does not believe that failure to allow impeachment in this one area, even if improper, would warrant setting aside the verdict. The plaintiff now argues that rather "extravagant" claims are now being made regarding the supposed importance of this matter; the plaintiff notes the defendant made no offer of proof by questioning the plaintiff outside the jury's presence. In response to the latter position the defendant in its reply brief makes what to the court is the rather curious statement: "Instead of directing Defendant's counsel to make an `offer of proof' on these issues, however, the Court chose to issue a cryptic instruction to the jury striking the testimony it heard hours earlier without any context or explanation." The testimony referred to was that offered by the plaintiff regarding alleged overpayment of Kahn. The Court felt since it was not going to allow the impeachment the plaintiff shouldn't be allowed to rely upon this testimony.
What is curious about the defense statement just quoted is the implication that a trial court somehow has an obligation to direct counsel to make an offer of proof. That is what lawyers do CT Page 8461 to make a record. This record will disclose that the Court gave both sides a chance to make a complete record — the argument on the legal issue alone presented here covered scores of pages of the transcript. Also the reference to a "cryptic" instruction misses the point. The point is that the jury was allowed to hear nothing of this handwritten statement by the plaintiff. How could the Court reference it then in striking earlier testimony? The only way it could have done so would be to inform the jury of a document it had decided not to be referred to in cross examination. In the context of the trial the instruction was not "cryptic" in the sense that the effect of the Court's ruling was to remove certain evidence the plaintiff hoped to rely on and in effect prevent plaintiff's counsel from referring to it in closing argument.
But the real basis of the Court's ruling on this matter must be fully addressed. The document the defendant sought to use to impeach the plaintiff was created several years before trial. The court had every reason to believe that plaintiff's counsel did not know of its existence before defense counsel started questioning from the statement. The deposition of Mr. Kahn was held in Florida quite a period of time before trial. There is no question that Kahn had an obligation to turn this statement over to plaintiff's counsel before or at the time of the deposition because of the subpoenas served upon him Mr. Kahn did not turn the documents over but sometime after the deposition did turn it over to defense counsel, at least the court received no explanation of how this document came into the possession of the defendant. Mr. Kahn had a motive to curry favor with SNET at or around the time of the relevant events in this case since it can be assumed he did not wish to lose a valuable account with SNET because of the difficulties Mr. Kuselias was experiencing because of the latter's dealings with Kahn. Although defense counsel had no obligation to turn the statement over to counsel for the plaintiff, a Pandora's Box would be opened if counsel down the line could rely on documents for impeachment or any other purpose which were not turned over to his or her opponent in violation of discovery by a deposed witness who had reason to curry favor with the party now seeking to use the documents. The Court believes now as it did at the trial where its reasons were more completely set forth that its general right to preserve the integrity of discovery procedure justified the action that it took.
DEFAMATION PER SE
CT Page 8462
The defendant claims the court erred in its instruction on the defamation claim by instructing the jury that accusations the plaintiff "misused" SNET funds for personal trips constituted defamation per se.
In the context of this case and the evidence produced, the word "misused" has a somewhat clinical or abstract ring to it. A reasonable or ordinary hearer or reader of the alleged slander or libel in this case would construe the accusations made as saying the plaintiff was purely and simply a thief.
The defendant rests its argument on a claim that what was charged here were no more than specific acts — that the plaintiff misused company funds for personal trips. Since that is so, the argument goes, such statements are not defamation per se. The defendant cites numerous cases where courts have concluded that words of general abuse, regardless of how rude, uncouth or vexatious, are not slanderous per se.
The court concludes the defendant's argument fails because there is no substance to its first premise — only specific acts were bandied about. In Miles v. Perry, 11 Conn. App. 584 (1987), the defendants argued on appeal "that the statements made by them are not actionable because they do not implicate the plaintiff in misappropriation or embezzlement but merely point out discrepancies in her bookkeeping." Id. P. 601.
The court first dealt with the issue as to whether accusations of theft constituted defamation per se and then dealt with whether the words used in the case before it could be construed as accusations of theft.
As to the first issue the court said the following:
 "Libel is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business. . . . Slander is actionable per se if it charges incompetence or dishonestly in office, or charges a professional person with general incompetence. . . . Libel or slander is actionable per se if it charges a crime involving moral turpitude or to which an infamous penalty is attached. . . . Statements accusing a plaintiff of theft are libelous CT Page 8463 or slanderous per se. . . ." Id. pp. 601-602.
Also, see 50 Am.Jur.2d § 185, "Libel Slander."
The court cites Yavis v. Sullivan, 137 Conn. 253 (1950) for the last mentioned proposition where the court said: "The words spoken as proved under the first count of the complaint were in substance that the plaintiff was a thief and had tried to steal the defendant's securities. If these words were taken in their ordinary meaning they charged an infamous crime involving moral turpitude, and, accordingly were actionable per se. . .", id. p. 259. In Yavis, the defendant explicitly called the plaintiff a thief. Do the words thief, robber, larcenous felon have to be used? Not according to Miles v. Perry, which addressed this as the second issue previously mentioned.
The court in Miles v. Perry said at 11 Conn. App. Pp. 602-603:
 "There was ample evidence in the trial record for the trial court to conclude that the defamatory statements were actionable per se. Whether words are actionable per se is a question of law for the court. . . . All of the circumstances connected with the publication of defamatory charges should be considered in ascertaining whether a publication was actionable per se. The words used, however, must be accorded their common and ordinary meaning, without enlargement by innuendo. . . . The trial court specifically found that the defendant had accused the plaintiff of wrongful diversion of funds and that such an accusation amounted to an accusation of theft. The defendants claim that they did not accuse the plaintiff of theft. It is their argument that although they used the word `misappropriation', they meant only that the plaintiff has `misapplied' funds. The context in which the words were used make it evident that an accusation of theft was being made."
The court here concluded that when you say the plaintiff "misused SNET funds for personal trips to Hawaii and Toronto" you are saying on the face of it that the plaintiff took money belonging to his company and used it for his own private adventures — that's theft. The evidence more than supported the conclusion that theft was being alleged here. On page 45 of its CT Page 8464 first brief, the defendant argued strenuously that it should have been allowed to cross examine Mr. Kahn about an "accounting" of funds he gave to Kahn. The company held the position that SNET monies generated in Kahn's travel agent account were used by the plaintiff for his own personal use. At the page just noted, the defendant argued: "Yet the `accounting' is far more significant than simply an instrument for impeachment. It shows cash dealings and credit dealings between Kahn and the plaintiff, which are far more sinister than Plaintiff's basic story." This gives quite an accurate flavor of the nature of the accusations made here and what could be deduced from them.
 BURDEN OF PROOF UPON DEFENDANT AS TO TRUTH OF DEFAMATORY STATEMENTS
The defendant SNET also maintains the court erred in its instructions on defamation by placing the burden of proof upon the defendant as to the truth of the alleged defamatory statements. At common law a defamatory statement must be false but truth is an affirmative defense and the burden is on the defendant to prove it. Atwater v. Morning News Co., 67 Conn. 504,520 (1986); Goodrich v. Waterbury-Republican American, Inc.,188 Conn. 107, 122 (1982). "Libel Slander", 50 Am.Jur.2d § 112, p. 418, Law of Torts, Harper, James Gray, 2d edit., § 5.20 pp. 168-169. Recent United States Supreme Court decisions have shifted the burden of proof in certain situations. The leading cases are New York Times Co. v. Sullivan, 376 U.S. 254
(1976); Dunn Bradstreet, Inc. v. Greenwood Builders, Inc.,472 U.S. 749 (1985); Philadelphia Newspapers, Inc. v. Harris, 475 U.S. 767
(1985). Some commentators seem to suggest that these cases hold that as a matter of constitutional law the plaintiff has the burden of alleging and proving falsity in all situations. The Restatement appears not to take that position. See second paragraph of comment j to § 613, cf. to comment j to § 580 B of Restatement (Second) Torts. Where the plaintiff is a private figure and the matter involved is not one of public concern, it is difficult to see how any constitutional issues under the First Amendment are raised that would require a change in the common law allocations of the burden of proof. Thus, if the Hepps case is read closely, it appears to say that when speech is of public concern and the plaintiff is a public figure higher barriers are required of a plaintiff if the plaintiff seeks damages against a media defendant, 475 US at p. 775, and the case went on to also hold that where a newspaper publishes speech of public concern about a private figure, the private CT Page 8465 figure plaintiff cannot recover damages without also showing that the statements at issue are false. Thus, in these types of cases the constitution mandates that the common law no longer applies, requiring that a defendant has the burden of showing the truth of any alleged defamatory statements. Id. At p. 778. The Hepps court itself said, however, that: "When the speech is of exclusively private concern and the plaintiff is a private figure, as in Dunn Bradstreet, the constitutional requirements do not necessarily force any change in at least some features of the common law landscape." Id. at p. 775. Whatever this cryptic remark might mean is unclear but it is certainly not up to a trial court to use this as a basis to change the common law landscape. This is especially so when private figures are involved. Mr. Kuselias certain is one, and no showing has been made to indicate a matter of public concern is at issue. As stated in the discussion inHarper v. James at § 5.20 pp. 175-176: "There is considerable unease with the notion that plaintiffs must disprove defamations that few of us could disprove about ourselves, no matter how scandalous and no matter how unfounded." The "unease" should perhaps be greater when large corporations with access to all or many of the facts that might or might not substantiate a statement are defendants. Except in cases where public concerns were in fact raised, the common law reluctance to place the burden of proving a negative on a plaintiff especially where the defendant has at least equal if not more access to the facts which would or would not establish the truth of a particular proposition was well founded.
The defendant cites several cases for the proposition that numerous courts have concludes that a private figure plaintiff in a defamation case involving speech of a private concern bears the burden of truth. Vereen v. Clayborne, 623 A.2d 1190, 1195 (DC App. 1993); Caruso v. Local Union No. 690, 730 Conn. P.2d 1299, 1302 (Wash. 1987); Jacron Sales Co., Inc. v. Sindorf,350 A.2d 688, 698 (Md. 1976); Madison v. Yunker, 589 P.2d 126 (Mont. 1978); Moss v. Stockard, 580 A.2d 1011, 1022 (DC App. 1990);Gazette, Inc. v. Harris, 325 S.E.2d 713, 725 (Va., 1985); Wilsonv. Scripps-Howard Broadcasting, Co., 642 F.2d 371, 374-375 (AG, 1981).
The cases cited do not stand for the broad proposition that the defendant claims. Vereen v. Clayborne, supra, and Moss v.Stockard, supra, adopted a local rule departing explicitly from the common law allocation of the burden of proof as to the issue of falsity — something our state has not done. These two cases CT Page 8466 raise another interesting point. In the earlier Moss case, the District of Columbia court of Appeals specifically noted that a majority of the Supreme Court in Gertz v. Robert Welch, Inc.,418 U.S. 323 (1973) rejected the notion that its applicability should depend on whether a media or non-media defendant was involved. But in the later Vereen case at 623 A.2d p. 1195, f 4, the court had to note that "the Supreme Court declined in PhiladelphiaNewspapers [v. Hepps], to consider what standards would apply [when a private] plaintiff sues a non-media defendant." Here we have a non-media defendant where the matter does not even involve an issue of "public concern."
Jacron Sales Co., Inc. v. Sindorf, supra, held that in a private defamation action brought by a private person on a matter of private concern the common law rule would be abandoned and the defendant would not have the burden of proving truth. But this case relied on its reading of Gertz and predated PhiladelphiaNewspapers, Inc. v. Hepps, supra.
Wilson v. Scripps-Howard Broadcasting Co., supra, involved a media defendant. Caruso v. Local Union No. 699, supra, involved a situation where the defendant published the allegedly defamatory statement in a newsletter with statewide circulation. Madison v.Yunker, supra, arose out of an article in a university student newspaper. In Gazette, Inc. v. Harris, supra, three of the defendants were media defendants, one was a private person but as to the private person, Gazette, Inc. v. Harris, supra, does adopt the position advocated by the defendant. The Supreme Court of Virginia, without reference to the common law, adopted the position that in Virginia the defendant no longer had to advance an affirmative defense of truth. This court as a trial court does not have the luxury of departing from the common law. But it is unclear from reading the opinion as to how far the court felt it was required to hold as it did because of Gertz and apparently the matter published was one of public concern. 325 S.E.2d at pp. 724-725.
The practical difficulties resulting from the application of the common law rule as to allocation of the burden of proof on truth where the plaintiff has the burden of fault is perhaps overstated and in any event hasn't been recognized as a problem in the application of a rule that this court has no authority to change.
DEFAMATION INSTRUCTION CONCERNING ABUSE OF PRIVILEGE
CT Page 8467
The defendant claims that the abuse of privilege instruction was unduly repetitive and weighted in plaintiff's favor. The plaintiff has countered that an appropriate objection was not made to which the defendant demurred in a reply brief. I do not have a copy of the transcript so that I will not base my decision on this claim.
However, I do not agree that the instruction as given regarding abuse of privilege was excessively long in comparison to the rest of the instruction on privilege. Whether or not the privilege has been abused and under what circumstances is a complicated question and required a lengthy instruction.
The defendant also takes issue with the instruction on "recklessness" which had bearing on the possible abuse of the privilege. The Court said that: "recklessness requires an awareness of facts that could or would disclose or lead to the disclosure of the falsity of facts to a reasonable person and a conscious disregard not to take account of those facts or not to make a reasonable effort to secure those facts." The charge might be said to be too favorable to the defendant in certain respects since the first portion of the instruction: "recklessness requires an awareness of facts that could or would disclose or lead to the disclosure of the falsity of facts to a reasonable person" is connected to the rest of the instructions by "and" not "or".
Also, the words "conscious disregard" modify all the language that follows them. It is also true as the plaintiff notes that the jury returned a general verdict here so it is not clear on what basis the jury found an abuse of privilege.
MISSING WITNESS INSTRUCTION
Hayden Owens was a high official of the defendant at the time of the events surrounding the plaintiff's termination. This individual was not called by either side. The plaintiff requested the Court give a so-called Secondino charge — see Secondino v.New Haven Gas Co., 147 Conn. 672 (1980).
The Court refused to give such a charge but only told the jury Mr. Owens was equally available to both sides. The Court did not instruct the jury that any adverse inference could be drawn against either side as the result of the failure to call Mr. CT Page 8468 Owens.
The defendant now makes much of the fact that the giving of a "missing witness" instruction was "legally improper, unnecessary, and unduly prejudicial to SNET". This passes the understanding of the Court. In fact, the Court did not give a missing witness instruction to the jury as such a charge is ordinarily understood. The aspect of such a charge that runs the risk of creating unfair prejudice is that portion where the Court permits the jury by its instruction to draw an adverse inference against a particular party who did not call the witness. The defendant concedes that the jury knew Owens was in the courtroom or was otherwise available to both sides. The Court merely reiterated what the jury knew as a purely factual happenstance. The defendant quotes at length from the plaintiff's closing argument wherein he referred to the defendant's failure to call Owens. The short answer to this is that the defendant had the opportunity to use the same argument against the plaintiff, rebut plaintiff's counsel, or say nothing on the subject.
The defendant confuses the propriety or not of the Court giving an adverse inference instruction with the right of counsel to argue such an inference to the jury. The point is the Courtdid not give a missing witness instruction, or Secondino
instruction, or adverse inference instruction as those terms are properly understood. The Court just noted to the jury that either side could have called Mr. Owens and left it to both sides to argue their positions on this point. Besides, no exceptions were taken to the plaintiff's closing argument on this matter.
 COURT'S REFUSAL TO GIVE "BUSINESS JUDGMENT" INSTRUCTION
The defendant properly notes that it has been held that: "The employer is allowed, in ordinary circumstances, to make personnel decisions without fear of incurring civil liability." Myers v.Hartford Courant, Co., 200 Conn. 676, 679 (1986). SNET argues the court erred in failing to give the charge proposed by SNET as to "the business judgment rule" based as it is on "well-founded legal principles."
Having given an instruction on privilege in the defamation charge, it is difficult to understand as to that claim what further policy objective would be served by giving a business judgment rule instruction. Myers was a wrongful discharge case. CT Page 8469 Here in the negligent infliction of emotional distress claim, the propriety of the termination was not at issue nor even whether the termination was unreasonable. The cause of action turned on whether the employer's conduct during the termination process was unreasonable. Businesses do face protection from suit for hurt feelings or summary discharges not constituting violations of public policy but the instruction given here assumes all that. It merely says when a business exercises those rights it not do so unreasonably and, more particularly, should not act in such a way so that the manner of termination would knowingly involve an unreasonable risk of causing illness or bodily harm to the terminated employee in a case where a jury finds such harm may occur. If a jury makes such findings in this context what societal, let alone efficient operation of business purpose could be served by giving a business judgment charge? The finding of such liability on such a basis by its very nature excludes the desirability of any such rule of law and from that perspective giving such an instruction would serve to confuse a jury.
SPECIAL INTERROGATORIES
The defendant claims the Court erred in failing to submit to the jury its special interrogatories. The Court's memory of what transpired here is different from that of counsel. A charging conference was held on this matter. The Court's memory is that both sides presented interrogatories and there was a discussion concerning the interrogatories that in fact would be given to the jury. No agreement was reached and the Court's memory is that both sides agreed and understood that their interrogatories would not be submitted to the jury. The following morning the Court proposed its own interrogatories but both sides rejected this.
What persuades the Court that it's memory is correct is the fact that the defendant did submit quite a few interrogatories, a charging conference was held where they were discussed, the argument to the jury and the instructions to the jury were to occur the next day. The Court would not have blanketly refused to submit to the jury not only all but any of the interrogatories given by either side and certainly would not have terminated the charging conference without explicitly informing the lawyers for both sides. Also, the fact that the Court suggested to both counsel that an interrogatory be submitted as to one area or question, confirms at least to the Court, it's understanding that otherwise no interrogatories were to be given. CT Page 8470
When exceptions were taken as to the failure to submit the interrogatories, the Court put its memory of what had occurred on the record at a point in time soon after these events.
 EXCESSIVENESS OF DAMAGE AWARD FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
A damage award of $380,000 was rendered in the plaintiff's behalf on the count of negligent infliction of emotional distress. The defendant claims it was excessive for a variety of reasons.
This is the type of issue in which there is and of necessity can be little in the way of guidance from the Appellate Court. Each case presents a unique constellation of facts, the trial judge is in the best position to weigh those facts and perhaps most importantly a plaintiff has a right to a jury trial and in most cases it is inappropriate for a trial court to reduce those damages that a jury felt were appropriate. Also, when courts move into areas where there is little possibility of formulating rules to guide their opinions there is a real danger that decisions will only be based on what the personal views and background of a particular judge dictate rather than what is truly appropriate.
In any event, this court in Stebbins v. City of New Britain,et al., 12 Conn. L. Rptr. 48 (1994) tried to review the appellate cases in this area and will rely on that earlier decision. The leading cases are Buckman v. People's Express, 205 Conn. 106
(1967); Todd v. Glines, 217 Conn. 1, 7 (1991); and Bartholomew v.Schweizer, 217 Conn. 671, 686 (1991). After reviewing the cases, the court believes it is fair to say "that in light of the necessary respect we should have for a person's right to a jury trial a damage award should not be reduced unless there is extrinsic evidence of partiality, corruption, prejudice or mistake or there is some fair criticism that could be made of the jury instructions especially where a case by its very nature is such that a jury may be swept by outrage or sympathy and the instructions do not adequately caution the jury as to those factors. Otherwise, a jury verdict should not be viewed as excessive unless it is extremely high and there was scant and completely unpersuasive evidence at trial as to damages." 12 Conn. L. Rptr. at p. 49.
There is no claim that the damage award here was the result of partiality, corruption, prejudice or mistake. It is also true CT Page 8471 that to the court's memory an instruction was given to the jury that cautioned them against letting sympathy affect their deliberations, that the defendant's corporate status was to play no part in their decision, and that damages otherwise fair could not be added to for the purpose of punishing the defendant or setting an example. There was no rush to judgment in this case. The jury deliberated for approximately three days. Testimony presented by the plaintiff did present sympathetic factors and considerations concerning the illness he was suffering and the effect on his social and emotional life brought about by the incidents involved in this case. But the testimony was not of such a shocking nature nor was it presented in such a way that there was a likelihood that this jury was swept by outrage or sympathy — the length of their deliberations alone precludes such possibility.
The defendant also points to various aspects of the charge on this tort which it claims were incorrect — the court failed to instruct the jury that in order to find the termination unreasonable it had to be done in an inconsiderate and humiliating manner — the court failed to define unreasonable conduct and failed to limit or otherwise define the termination process. These are interesting remarks and, if they are well taken, may mean the verdict should be set aside here or on appeal. But it is difficult to factor these considerations into the argument here. In other words, if there was evidence improperly let into the case or the jury instructions were erroneous such that the verdict should be set aside, so be it and it should be so set aside but there is little point in the trial court reviewing these factors on the excessive damage issue. If in fact there was error but not enough to warrant setting aside the verdict, how does a court possibly factor that in to rationally reduce damages.
Insofar as the defendant's argument suggests that on the damage issue the jury could only consider the date or dates of the termination process as a basis for damage without having the right to consider the life experiences, feelings, fears and hopes that he brought into such time period, the court believes the argument is simply wrong. This issue is related to an analysis ofBuckman v. People's Express, supra, which the court will now discuss insofar as it relates to this case.
In Buckman the plaintiff sought damages from his former employer claiming he had suffered emotional distress as a result CT Page 8472 of the failure of that employer, a self-insurer, to allow him to continue his health insurance as required by statute after his discharge. He further claimed the defendant employer failed to act in good faith with regard to his interests in continued group coverage. The court found that there were $1595.94 in special damages associated with the claim and concluded that $50,000 additional damages were excessive so as to shock the conscience. The court therefore ruled the judgment of the trial court would be set aside and a new trial ordered unless within three weeks of its decision the plaintiff were to file a remittitur of $35,000.
The court rendered its decision based on the following evidence that it concluded was before the jury: at the time of the termination, the plaintiff needed insurance and the defendant was aware of this; at that time the plaintiff was suffering from a recurrent ulcer and as well as a problematic dental consideration, the defendant knew he had serious health problems; also, the plaintiff's wife had been enduring a difficult pregnancy and in fact had a completed delivery two months premature, id. p. 176. That's it. There is nothing more.
Here, as the plaintiff notes, certain facts and inferences could be drawn which could be said to support the damage award and make it a different case from Buckman. The court will not repeat all the 19 factors referred to in the plaintiff's brief but they are well-taken and supported by the evidence. Among the salient considerations are that at the time of termination Kuselias had been receiving treatment for terminal cancer and had been told he had only six months to live in the 18 months preceding his termination; the defendant was aware of his condition as it was of the fact that this 28 year employee had two sons and a daughter-in-law working at the company when any reasonable co-worker could perceive he was being accused of being a thief. There was ample testimony that this man's whole life was his work with the company and the company ran its operations and dispensed its favors and benefits to encourage that type of commitment. He became depressed and socially isolated, according to the evidence the jury heard, and shunned by former friends and associates at the company. He had to take tranquilizers and other medication and testified he contemplated suicide. He said he lost35-40 pounds and had stomach pains and suffered anxiety that his cancer was recurring. He was escorted from the building in front of co-workers and wasn't even allowed to enter the building during business hours to remove his belongings. At the time of these incidents he had a fairly highly placed position in which CT Page 8473 he supervised others and had received recognition for his performance in the past. The accusations came without warning and upon his return from a vacation. The evidence revealed the charges were investigated in an intense and vigorous manner and there was evidence from which the jury could have concluded that he was not made aware of all the details of the charges against him. This is not then a case of recurrent ulcers and a man with a dental problem. How does a court conclude that based on these facts the jury's verdict was excessive or shocked the conscience — whose conscience and where, where is the talisman by which the court can reach that conclusion? The court will not set the damage award aside as excessive.
 AWARD OF $120,000. FOR FUTURE ECONOMIC LOSS ON DEFAMATION CLAIM
The defendant basically argues that there was nothing in the evidence to support the claim for economic loss on the defamation claim. It points out that Mr. Kuselias failed to provide any specific monetary amount to determine the loss sustained. There was no evidence presented as to his base salary on February 5, 1990 when he was terminated from his District Manager position, how long he held any such position, what his salary was in his demoted position, how much he lost in his demoted position year by year, what change there was in his commission compensation year by year after he was demoted, how much over $70,000 he was making at the time of his layoff on March 5, 1990, how long he had been making over $70,000 prior to his layoff and whether the "over $70,000" he testified he was making at that time meant his base salary alone or his base salary plus commissions. Without such information, the defendant argues the jury was left to award damages to the plaintiff "based on pure speculation and conjecture", p. 90 of Post-Trial Brief.
It is useful to quote the instruction given by the court to the jury on future economic loss:
 "The plaintiff also claims that as a result of the defamation he will suffer a future loss of employment opportunity; that is earning capacity. To be entitled to such a claim the plaintiff must establish through evidence that the defendant's statements which can be attributed to the defendant actually interfered with his ability to find CT Page 8474 employment since his layoff in March 1995. If he has proven that loss to you, you may consider the amount of damages to which he is entitled.
 If you find the plaintiff has proven such loss to you by a preponderance of the evidence in trying to ascertain such loss you would consider the type of job he would have other wise been able to procure and the salary he might have been expected to earn. In determining such amount, you cannot arrive at a figure with mathematical certainty, but you may consider Mr. Kuselias' past professional experience and job responsibilities, his salary at that prior job so that you would enable him to receive compensation for the amount of future income he will have lost as a result of the defamation.
 Now claims for loss of future employment or loss of earning capacity as other claims for damages must not be based upon speculation or surmise, but the plaintiff must give you a reasonable basis in the evidence to conclude by a preponderance of the evidence that he is entitled to such recovery."
The Court explicitly instructed the jury that they were to be concerned with "future loss of employment opportunity".
The factors supporting the jury's verdict were: (1) the testimony that Mr. Kuselias was earning over $70,000 when was laid off in March of 1990; (2) he testified that he wanted to work until he was 70; (3) he was a talented individual with many years of experience and there was evidence presented that could lead the jury to conclude he had excellent work habits; (4) while he had had serious health problems, there was no evidence to indicate at the time of trial that any health problem would interfere with his expressed desire and physical or mental liability to seek work or keep working efficiently.
There was testimony that because of the defamatory accusation the defendant could not give Mr. Kuselias a positive CT Page 8475 recommendation. It would be difficult to argue here that his demotion in May 1990 did not result from the accusation made against him, the acceptance of which by the defendant as true, led to his removal from a more important position in the company. It is equally difficult to conclude that Mr. Kuselias in his efforts to find a new job would not feel strongly compelled to reveal to prospective employers the reasons for his demotion, since it is not idle speculation to conjecture that any such prospective employers would contact SNET themselves to find out about his job performance. As a large sophisticated corporation with layers of experienced managerial personnel, the defendant company certainly could be held to have foreseen the difficulties a former employee might have in securing a new job without a positive recommendation and due to a transfer to a demoted position after years of employment caused by the defendant company's acceptance of and reliance on matters the jury has concluded were defamatory.
At the time of the trial in the fall of 1995, Mr. Kuselias had already been out of work for eight months.
The jury apparently concluded that the defamation would naturally lead to difficulties for Mr. Kuselias in securing future employment, they further concluded that he would have difficulties for another year or so after the conclusion of the trial. If one is harmed in the way the jury could reasonably speculate Mr. Kuselias was harmed, how does one "prove how prospective employers would react to defamatory accusations such as those made here, could a market survey be provided? The evidence presented given the nature of the wrong was the best that could be provided.
As to this and the other claims made, the Court rules in the plaintiff's favor and does not grant the Motion to Set Aside the Verdict.
CORRADINO, J.